KANSAS CITY SOUTHERN RY. CO. et al. v. SILICA PRODUCTS CO.

No. 8954.

Circuit Court of Appeals, Eighth Circuit.

March 13, 1931.

Rehearing Denied May 4, 1931.

Arthur C. Brown, of Kansas City, Mo., for appellants.

Thomas E. Scofield, of Kansas City, Mo. (Henry N. Ess, I. N. Watson, John B. Gage, Powell C. Groner, and Paul V. Barnett, all of Kansas City, Mo., on the brief), for appellee.

Before KENYON and BOOTH, Circuit Judges, and REEVES, District Judge.

BOOTH, Circuit Judge, delivered the opinion of the Court.

This is a patent suit in conventional form involving reissue patent No. 17,207, granted to Orlando A. Collings, February 5, 1929, for "waterproof plastic." The original patent, No. 1,650,864, was granted November 29, 1927; application filed April 3, 1922. Ownership is in appellee, Silica Products Company, plaintiff below.

In the specifications of the original patent, as well as in the reissue, the invention is thus described:

"This invention relates to waterproof plastics; and it comprises a method of waterproofing concrete, stucco, plaster of Paris, etc., wherein the materials employed for making such a plastic are admixed, at the time of gaging or prior thereto, with an insoluble dry mineral matter of the nature of a gelatinizable 'reversible colloid', such as dry bentonite; and it further comprises as a new and waterproof material, a set calcareous plastic material, containing disseminated particles of a relatively dry mineral material having the properties of a gelatinizable reversible colloid, such as bentonite; all as more fully hereinafter set forth and as claimed."

The specifications further describe the purpose, process, and product as set out in the margin.[1]

Numerous defenses to the suit were set up, including (1) invalidity of the patent because the alleged invention was for an inoperable process and an impossible product; (2) invalidity for lack of invention in view of the prior art; (3) invalidity because the reissue patent was for a different invention than the original; (4) invalidity for lack of diligence in filing application for the reissue; (5) intervening rights of the defendant between the granting of the original patent and the reissue; (6) noninfringement.

It is contended by defendants that the defense of invalidity on account of indefiniteness was also set up. We shall touch upon this later.

The trial court, by its decree, adjudged claims 1, 2, 7, 8, 9, 10, 11, 12, 13, 14, and 15 of the reissue patent valid and infringed; and ordered an injunction and an accounting. The present appeal followed.

Claims 1 to 10, inclusive, are identical in the original and in the reissue. Claim 2 may be taken as typical of the process; claim 7 as covering the intermediate stage plastic composition; claim 10 as covering a final stage product. Claim 12 of the reissue may be taken as typical of the first or dry stage of the mixture. They read as follows:

---

[1] "As water and cement after setting do not have quite their original joint volume and as a limit is placed to the contraction of the concrete as a whole by the rigidity of the coarser aggregate, it follows that such a concrete must be, of necessity, more or less minutely pervious. * * * Sometimes this pervious character is unimportant, as in cases where the concrete is not used in wet or moist situations. But sometimes the pervious character is a serious objection, as in concrete exposed to water under hydrostatic head, in stucco coatings, etc.

"It is the purpose of the present invention to obviate this penetrability by water. To this end, I use in concrete of normal composition, in addition to the usual materials, a small proportion of a dry mineral matter having the properties of a reversible swelling or gelatinizable colloid; that is, capable of swelling with water and of being dried without forfeiting its swelling power on again wetting. * * * I regard some varieties of a mineral known as bentonite as the most available for the present purposes. * * * Although sometimes regarded as being, generically, a 'clay' bentonite is not really a clay in the ordinary sense. Unlike clays, a moderate degree of roasting does not impair materially its property of taking up water to form a plastic mass. Like the clays, however, the presence of free lime tends to hinder its assuming a dispersoid state or condition; and, for this reason and because its hydration requires time, it can be admixed with the wet concrete batch without much moistening or swelling. The water of the wet mix goes preferentially to the cement constituents during the time occupied in setting and the bentonite remains relatively dry; in a condition in which it is able to take up water. After the concrete is set these minerals are hydrated and the bulk of the free lime has disappeared so that free swelling of the bentonite by water is no longer inhibited. * * *

"The bentonite is advantageously used in a rather coarse condition although for some purposes. It may be used in a somewhat finer condition. It may be admixed with cement in the clinker grinding mills or added to the mix just prior to making the concrete. In the concrete, it does not swell to any material extent during mixing and setting, for reasons stated ante, nor is it much affected by the cement; it remains in the wet material in its original unhydrated state during the setting. On subsequent exposure of the said concrete to water, the moisture entering through any pore encounters the bentonite and swells it, effectually plugging the pore. Concrete made with 2 to 5 per cent bentonite is capable of withstanding considerable hydrostatic heads of water. Higher proportions may be used."

"2. The process of preparing a calcareous plastic capable of becoming impervious to water on access of moisture which comprises mixing dry bentonite with water and a cement of the Portland cement type, the amount of water used being merely that which will be taken up by the cement. * * *

"7. A plastic composition which will set to form a waterproof concrete comprising Portland cement and approximately five per cent. of bentonite. * * *

"10. Set calcareous cement containing bentonite in such condition as to swell upon access of moisture thereto, thereby rendering said cement impervious to water. * * *

"12. A composition consisting of hydraulic cement and bentonite adapted to form a plastic upon the addition of water."

It is thus seen that the claims cover not only the process but the product in three stages: dry, plastic and set.

### Operability.

On the question of operable invention, much evidence was introduced, and it was of a contradictory character. Tests had been made on behalf of both parties, and the results of those tests were introduced in evidence. The results appeared to be contradictory. Some of the seeming contradiction arises from the fact that in the defendants' tests, an amount of bentonite was used differing from the amount used in the plaintiff's tests. This diversity arose from a difference in construction of the patent by those directing the tests for defendants and those directing them for plaintiff.

In the specifications of the patent is found this language:

"I use in concrete of normal composition, in addition to the usual materials, *a small proportion* of a dry mineral matter [bentonite]. * * *" (Italics ours.)

Also in the specifications occurs this statement:

"Concrete made with 2 to 5 per cent. bentonite is capable of withstanding considerable hydrostatic heads of water. Higher proportions may be used."

The exact amount, however, is not stated in the specifications. None of the claims specifies the amount except claims 7, 8, and 9. Claim 9 reads as follows:

"A waterproof Portland cement concrete of at least normal strength characterized by the admixture of approximately five per cent. of bentonite with the cement before it has set."

The words "approximately five per cent. of bentonite" also occur in claims 7 and 8. Plaintiff contends that the language means that the amount of bentonite is to equal 5 per cent. of the amount of cement used. Defendants contend that the language means 5 per cent. of the whole concrete mix. We think the language in the three claims mentioned is ambiguous in reference to the amount of bentonite to be used. The trial court held that the percentage of bentonite was to be "understood as calculated upon the amount of cement used and not on the amount of concrete." If this construction is adopted, the invention under the evidence is clearly operable. Furthermore, as we shall hereafter see, defendants have quite closely followed the process of plaintiff's reissue patent and have produced a correspondingly like product. An infringer is estopped from denying utility and operability. Dunkley Co. v. Cent. Calif. Canneries (C. C. A.) 7 F.(2d) 972, 976; Boyce v. Stewart-Warner Corp. (C. C. A.) 220 F. 118, 126.

We think the view of the trial court as to the amount of bentonite to be used is correct; and we reach that conclusion the more readily because of the rule that where the language used in claims is ambiguous, that construction should be adopted which will render the patent valid rather than one which will render it invalid.

### The Prior Art.

Reliance is placed upon Kraus, 1,509,406, September 23, 1924; Kraus, 1,629,714, May 24, 1927; Brookby, 1,627,952, May 10, 1927; Kraus, 1,509,478, September 23, 1924; Gossett, 1,487,057, March 18, 1924. The first three were cited in the Patent Office.

In considering these prior art patents, it should be borne in mind that the prime object sought in the Collings patent, original and reissue, is the waterproofing of concrete, stucco, etc. The plasticity or plastic condition referred to in the specifications and in some of the claims is merely an incident to one stage of the mixture. Kraus, 1,509,406, is concerned with the ceramic art and shows a method of increasing the plasticity of clay by mixing in bentonite as a plasticizing agent. Kraus, 1,629,714, is merely a divisional of 1,509,406. In neither of these patents is there any mention of concrete or Portland cement and no mention of bentonite for purposes of waterproofing. The cement rock used by Kraus is not the equivalent of Portland cement.

Brookby, 1,627,952, has for its object the production of a plastic cementitious material

for use as a mortar. It makes use of Portland cement and incorporates "a small percentage of finely divided hydrated lime and a small percentage of finely divided, highly plastic clay, such as plastic kaolin, china clay," etc. No mention is made of bentonite and no suggestion is made that the hydrated lime may be omitted. Moreover, Brookby is not properly an anticipating reference, inasmuch as the Brookby application was filed later than the Collings application.

Gossett, 1,487,057, is for a binding or bonding material which shall bind together various substances, vegetable or mineral, into a mass having the appearance of rock or stone. The binding material is made up of two solutions, in one of which bentonite is used along with iron rust and sulphate of copper. There is no mention of concrete or Portland cement and the bentonite is not mentioned as being used for a waterproofing agent.

Kraus, 1,509,478, relates particularly to refractory cements or mortars; bentonite is used as a bonding material and as a plasticizing agent. No mention is made of Portland cement or concrete and no use is made or suggested of bentonite for waterproofing purposes.

### Departure.

But it is contended by defendants that there is, in the reissue patent, a departure from the original patent which renders the reissue invalid; and if there is no departure, yet the claims 11 to 15 are invalid in view of the prior art. The reissue contains a number of minor changes in the specifications, and adds new claims (11 to 15), retaining the ten of the original patent.

The changes made in the specifications are clarifying and explanatory. They apply as well to the old claims as to the new. There is no change in the fundamental invention claimed in the original application, viz., a waterproof concrete as a final product and a process for producing the same. The changes in the specifications and the new claims merely make more definite what was apparent from an analysis of the old specifications, viz., that in carrying out the process, three distinct products would or could be produced; one at each of three successive stages of the process. The first-stage product would be the dry mixture of the finely ground clinker and the bentonite with or without a filler or an aggregate. The second-stage product would be the plastic composition. The third or final-stage product would be the waterproof set concrete. The second-stage prod-

uct was covered by claim 7 in the original patent. The third or final-stage product was covered by several claims in the original patent; but the first-stage product was not covered by any of the claims of the original patent. It was to remedy this omission that the application of the reissue was made. The new claims 11 to 15 of the reissue cover the first-stage product. These claims are limited by the specifications and cover only a mixture which will be or may be produced in carrying out the process whose final result is a waterproof concrete. The new claims of the reissue are merely subcombination claims. As thus limited, each of the new claims finds a basis in the specifications as originally drawn.

We hold that the reissue was not a departure and was not invalid within the authorities on the subject. Parker & Whipple Co. v. Yale Clock Co., 123 U. S. 87, 8 S. Ct. 38, 31 L. Ed. 100; Topliff v. Topliff, 145 U. S. 156, 12 S. Ct. 825, 36 L. Ed. 658; Universal, etc., Co. v. M. B. Schenck Co. (C. C.) 165 F. 344; Van Kannel, etc., Co. v. Winton, etc., Co. (C. C. A.) 276 F. 234.

In the Topliff Case, the Supreme Court said (page 170 of 145 U. S., 12 S. Ct. 825, 831):

"From this summary of the authorities it may be regarded as the settled rule of this court that the power to reissue may be exercised when the patent is inoperative by reason of the fact that the specification as originally drawn was defective or insufficient, or the claims were narrower than the actual invention of the patentee, provided the error has arisen from inadvertence or mistake, and the patentee is guilty of no fraud or deception; but that such reissues are subject to the following qualifications:

"First. That it shall be for the same invention as the original patent, as such invention appears from the specification and claims of such original. * * *

"Third. That this court will not review the decision of the commissioner upon the question of inadvertence, accident, or mistake, unless the matter is manifest from the record. * * *"

### Diligence.

Defendants further contend that the patentee failed to exercise due diligence in filing his application for reissue, and that therefore the reissue is invalid. We think this contention cannot be sustained. The application for reissue was filed eleven months after the issuance of the original patent. We

fail to find from the evidence that either defendant suffered any prejudice by reason of the delay of eleven months. In the absence of such proof, the two-year rule is generally applied to reissue cases.

In Chapman v. Wintroath, 252 U. S. 126, page 137, 40 S. Ct. 234, 236, 64 L. Ed. 491, the court said:

"In reissue cases, where there was no statutory time prescribed for the making of an application for the correction of a patent, and although unusual diligence is required in such cases, this court adopted the two-year rule as reasonable by analogy to the law of public use before an application for a patent. Mahn v. Harwood, 112 U. S. 354, 363, 5 S. Ct. 174, 6 S. Ct. 451, 28 L. Ed. 665; Wollensak v. Reiher, 115 U. S. 96, 101, 5 S. Ct. 1137, 29 L. Ed. 350."

See also Webster, etc., Co. v. Splitdorf, etc., Co., 264 U. S. 463, 44 S. Ct. 342, 68 L. Ed. 792; Topliff v. Topliff, supra.

### Indefiniteness.

■■■ It is further contended in this court by defendants that the reissue patent is void for indefiniteness. We think this defense is not open to defendants, first, because the defense is one which must be pleaded, and there is no sufficient allegation in the answer under which the defense could be made; and, secondly, the special allegation relied upon, in the answer, not being sufficient, no notice in connection with the general issue was given by defendants as required by 35 USCA § 69. Furthermore, the contention that the reissue patent was invalid for indefiniteness was not made at the trial and was not passed upon by the trial court. Speaking of this matter, that court said:

"I have not considered whether the patent may not be invalid for indefiniteness under the rule declared by the Supreme Court in Wood v. Underhill, 5 How. 1, 4, 12 L. Ed. 23; Tyler v. Boston, 7 Wall. 327, 330, 19 L. Ed. 93; and the Incandescent Lamp Patent, 159 U. S. 465, 474, 16 S. Ct. 75, 40 L. Ed. 221, since that issue is not raised by the pleadings nor was that contention made at the trial."

### Intervening Rights.

Defendants contend that between the date of the issue of the original patent and the date of the application for the reissue, they acquired certain intervening rights, so that the reissue patent cannot now be enforced against them. These intervening rights are not very clearly defined, but as we gather from the brief of counsel, they relate to the employment of bentonite in concrete to increase the plasticity or workability thereof. In view of what we have already said, we think there is no substantial merit in this contention of defendants. Walker on Patents (6th Ed.) § 299, states the law on intervening rights as follows (page 373):

"An intervening right is acquired by any person who manufactures and/or sells an article, or uses a process, between the grant of the original patent and the filing of the application for reissue, and not covered by the claims of the original patent, said party having relied on the omission of the original patent to claim the invention now embraced in the enlarged or broadened claims of the reissue; and that by reason thereof he is immune from liability and enjoys an irrevocable and permanent license to continue to manufacture and/or sell and/or use the invention without restriction."

On the 7th of February, 1927, Charles P. Derleth became licensee of Collings under the application which ripened into patent No. 1,650,864. The licensee admitted the validity of the patent to be obtained, and any reissue thereof. Mr. Derleth, proceeding under the license, sold bentonite under the trade name of "Colloy." Mr. Derleth was fully acquainted with the allowance of the patent and on December 5, 1927, wrote as follows:

"Mr. W. A. Collings,
"1300 South Los Angeles St.,
"Los Angeles, California.
"Dear Sir:
"My congratulations to you in your success in having allowed the patent covering the use of Bentonite in concrete and Portland cement compositions.

"We acknowledged Mr. Schofield's advice of allowance as per the attached copy and sincerely hope that the broad claims as originally requested have been allowed and it now is advisable to make fullest use of this patent.

"If there is any way that we can co-operate in your activity in the West, please do not hesitate to advise."

Some time in 1928, the license was canceled by Mr. Derleth. On February 11, 1928, defendant Colloy Products Company was incorporated, Mr. Derleth being a large stockholder, and it continued thereafter to sell its product "Colloy," as stated by its counsel, "in reliance upon the limitations of the plaintiff's original patent." In other words, Mr. Derleth and his company, the Colloy Products Company, in the exercise of their judgment, concluded that the process and the

product of plaintiff's patent lacked operability. But we have now held that the reissue patent, the first ten claims of which are identical with the ten claims of the original patent, is operable and valid. So far, therefore, as these ten claims are concerned, there can be no intervening rights of defendants. The Colloy Products Company simply speculated on the validity of the original patent. And as to the claims added in the reissue, there could be no substantial intervening rights of defendants. The new claims cover the first stage product or mixture formed in carrying out the process. This was not covered by the original patent. Assuming, but without deciding, that defendants, by reason of this omission, had the right to make this first-stage product or mixture, they have not stopped there but have carried out the full process and produced the final, finished product. They are therefore infringers. We are unable to see how any substantial intervening rights of defendants are prejudiced by the enforcement of the new claims of the reissue patent.

### Infringement.

There remains the question of infringement. The use by defendant railway company in making concrete with "Colloy" as a constituent is admitted, and the sale of "Colloy" by defendant Products Company to the railway company is also admitted. It is also admitted or proven that "Colloy" is made up of 40 per cent. of bentonite and 60 per cent. of silica. The process of admixture with the Portland cement is substantially the same as in plaintiff's patent. But defendants claim that the quantity of bentonite used by them is different from the quantity contemplated by the teaching of the patent; that the manner of use was different; and that the effect produced was different. As to the amount used, Dr. Roy cross-testified as follows:

"I would say that the percentage of Colloy to the cement was not over four per cent. It may have been somewhat under four per cent. Well, it might have been as low as two per cent. and possibly three per cent.; I would say as low as three per cent., possibly. I would estimate that it was somewhere between two and four per cent."

This would make the amount of bentonite used .8 per cent. to 1.6 per cent. of the Portland cement.

It is to be noted that except in the claims 7, 8, and 9, the reissue patent puts no limitation on the amount of bentonite except that the specifications use the expression "a small proportion." The reissue patent also contains this statement in the specifications:

"The amount of bentonite added is that which is necessary for retaining the plastic properties and giving waterproof qualities, and will vary within wide limits, depending upon the extent of the plastic and waterproof properties desired and the qualities of bentonite used."

We think the amount used by defendants would come within the claims 1, 2, 10, 11, 12, 13, 14, and 15, but not within 7, 8, and 9.

As to the manner of the use of the bentonite, it is the contention of defendants that plaintiff's patent requires that the bentonite shall remain in a dry state throughout the process, and also in the finished product, whereas defendants' use of bentonite includes the wetting of it during the process. As to this contention, it is sufficient to say that defendants' statement of what plaintiff's patent requires is not in accord with our understanding of the teaching of the patent.

As to defendants' contention that the result of their use of bentonite is to produce a water-tightening and not a waterproofing in the finished product, and, in support of this contention, that they use a different agent for waterproofing, all that need be said is that defendants have followed the process of the patent with substantial closeness. If in some slight particular there has been a variance and the result has been a product inferior in waterproofing to the product of the patent, this will not avoid infringement. "One does not escape infringement by practicing invention imperfectly." Gibbs v. Triumph Trap Co. (C. C. A.) 26 F.(2d) 312; Hobbs v. Beach, 180 U. S. 383, 401, 21 S. Ct. 409, 45 L. Ed. 586; Syracuse, etc., Co. v. Leroy, etc., Co. (D. C.) 233 F. 682; General Elec. Co. v. Alexander (C. C. A.) 280 F. 852, 855; McDonough v. Johnson-Wentworth Co., 30 F.(2d) 375, 384 (C. C. A. 8).

Even if defendants used the bentonite, as is claimed, for plasticity and water-tightening, and not for waterproofing, this would not avoid infringement. The purpose and intent of defendants is immaterial. Kawneer Mfg. Co. v. Toledo, etc., Co. (D. C.) 232 F. 362; Thompson v. N. T. Bushnell Co. (C. C. A.) 96 F. 238; Parker v. Hulme, 18 Fed. Cas. No. 10,740.

Our conclusion is that the decree should be modified so as not to hold claims 7, 8, and 9 infringed, and, as so modified, it is affirmed.