**NICHOLS et al. v. SANBORN CO.**

**No. 4260.**

District Court, D. Massachusetts.

Oct. 31, 1940.

708

Hyman J. Cohen, Lee M. Friedman, and Friedman, Atherton, King & Turner, all of Boston, Mass., for plaintiffs.

David Rines, Robert Cushman, William Gates, Jr., and Roberts, Cushman & Woodberry, all of Boston, Mass., for defendant.

McLELLAN, District Judge.

This is a suit for infringement of two patents, U. S. No. 1,647,710 and U. S. 1,-888,139. The plaintiffs, Horace E. Nichols, Clyde H. Chase and Hugo Freund, sue as the owners by assignment, of these patents, in both of which Horace E. Nichols is named as the inventor. The plaintiffs are residents of Detroit, Michigan. The defendant, the Sanborn Company, is a Massachusetts corporation, with its principal place of business in Cambridge, Massachusetts. The suit originally involved three patents, but the charges involving the third patent were dropped before trial.

### Patent U. S. No. 1,647,710.
### Findings of Fact.

This patent was issued November 1, 1927, upon an application filed July 2, 1920. It purports to cover a portable electrocardiograph, having as its basic elements a three-stage vacuum tube amplifier and a moving coil recording galvanometer. In order to make clear the issues here presented, a brief statement of the earlier history of the art is necessary.

Electrocardiography relates to the recording in the form of a graph of certain minute electric currents produced by the human heart in the course of its action. Although the existence of such currents was known as early as the middle of the last century, it was not until 1903 that an instrument able to detect and record them was invented. This instrument is known as the Einthoven quartz string galvanometer, named after its inventor. It consists of a very fine quartz string, gold-plated, which is suspended in a magnetic field. When current passes through the string, the string moves, and by photographing its excursions, a record of its movements may be produced. The electric currents produced by the heart are connected to the string galvanometer by means of electrodes attached to the arms or to one arm and one leg of the patient. When a galvanometer is thus connected to the human body, there is produced, in addition to the heart currents, a constant current of considerably higher amplitude than the currents produced by the action of the heart. This constant current is called the skin current. In order to record the action of the heart without overloading a sensitive instrument such as the Einthoven string galvanometer, it is necessary to overcome the effect of the skin current. In practice this is usually done by introducing from some external source into the galvanometer circuit a voltage equal in amount and opposite in polarity to that produced by the skin current. Since skin current varies from time to time and with the individual, this neutralizing voltage must be readjusted from time to time as the instrument is used.

As a result of the invention of the Einthoven string galvanometer, the growth of the modern science of electrocardiography was made possible. This, of course, is a medical science. As a result of many observations of recordings made with the string galvanometer, the physician has learned to recognize certain types of heart ailment from the records which they produce on the electrocardiograph. In order to facilitate this type of study, it has become standard practice to make recordings in which one centimeter represents one millivolt. Apparatus to permit this standardization, as it is called, is added to the

string galvanometer circuit in the complete electrocardiograph. For the same purpose, marks indicating the passage of standard units of time are also placed directly on the record, necessitating still further auxiliary apparatus. Since the medical science of electrocardiography has grown directly from the use of the string galvanometer, equipped in this manner, it is evident that any substitute, however perfect from the standpoint of the electrician or physicist, must be able to make records substantially similar to those produced by the string instrument. Otherwise, they are useless to the medical profession.

There are certain limitations or disadvantages inherent in the string galvanometer. Two among these may be mentioned. In the first place, the string instrument is quite delicate. It must be handled with considerable care. It does not lend itself readily to the construction of a portable instrument which can be carried to the patient, a highly desirable object. Later models minimize but do not wholly overcome this inherent difficulty. The defendant manufactured a portable string instrument which it adduced in evidence. While this instrument can be carried about, it clearly leaves much to be desired, from the standpoint of portability.

In the second place, since the string galvanometer is operated directly by current produced by the heart, the records will be affected by any resistance, particularly a variable one, in the circuit between the heart and the galvanometer. Such resistance is inevitably introduced at the point where the electrodes are connected to the skin. In order to avoid trouble from this source so far as possible, the patient at first was asked to place the arm or leg to which each electrode was attached in a bucket of salt water. Such treatment tended to make him nervous and thus to produce abnormal records. This difficulty was later partly but not wholly eliminated by the introduction of a paste which took the place of the buckets of salt water.

Some time in 1919, the plaintiff Horace E. Nichols began trying to overcome these and other disadvantages in the existing electrocardiograph by using a sturdier but less sensitive galvanometer in connection with a vacuum tube amplifier. By July 2, 1920, this work had progressed to a point where an application for the present patent was filed. The patent was eventually issued November 1, 1927. As shown in the patent drawing, the patient is connected directly to the grid circuit of a three stage resistance-capacitance coupled amplifier. The output circuit of the third vacuum tube is connected, through a condenser, to a moving coil recording galvanometer. The patent has four claims, all of which are involved in this suit. They read:

"1. The method of recording characteristics of muscular activities within living bodies, which consists in establishing a combined primary and amplifying circuit with the primary including selected portions of the living body, delivering to the established circuit the potential values produced by the normal activities of such living body including the potential values produced by the specific muscular activity being tested, and through the action of the established circuit suppressing the potential values of constant potential characteristics and recording the potential values of differential potential characteristic present within the potential values delivered to the established circuit.

"2. In a device for recording characteristics of muscular activities within living bodies, an amplifying circuit adapted to be rendered active by the potential values produced by potentials set up by the normal activities of the living body, means operatively connected to such circuit for obtaining from the body the potential values thus set up, said means including electrodes secured to the body at spaced points of such body, whereby the potential values of such normal activities including those of the muscular activity being tested will be delivered to the amplifying circuit, means within and forming a part of the amplifying circuit for suppressing all constant potential values delivered thereto, and means for recording the unsuppressed potential values.

"3. Means as in claim 2, characterized in that the suppressing means includes a condenser formation within the amplifying circuit.

"4. Means as in claim 2, characterized in that the amplifying circuit includes instrumentalities of the audion type."

The vacuum tube amplifier, so-called, is a result of the invention, in 1907, by Dr. Lee de Forest of the three-element vacuum tube. See De Forest U. S. Patent No. 841,-387. A vacuum tube basically consists of a filament, somewhat similar to that in an ordinary electric light bulb, surrounded by a wire screen, called the grid, and a piece of metal, called the plate, all three enclosed in a bulb from which the air has been ex-

hausted. When the device is used as an amplifier, the filament is heated from a battery, known as the "A" battery. When the filament is thus heated, electrons are emitted. If the plate is then connected to the filament through another battery, usually of somewhat higher voltage and known as the "B" battery, so that the plate is positive and the filament negative, the electrons will flow from the filament, through the grid to the plate, thus in effect closing the circuit and causing a flow of current from the "B" battery. The circuit in which the "B" battery is thus connected is called the plate circuit. If a negative voltage is then impressed upon the grid, as by connecting a third battery, sometimes called a "C" battery, between the grid and the filament, so that the grid is made negative with respect to the filament, the flow of electrons from filament to plate, and thus the current in the plate circuit, will be reduced or eliminated, depending upon the value of the negative voltage thus impressed. Thus if a variable voltage is impressed on the grid, from some external source, such as the human body, that varying voltage will control the current flowing through the plate circuit from the "B" battery. If a suitable resistor is connected in series with the "B" battery in the plate circuit and the initial voltage impressed on the grid by the "C" battery properly adjusted, a voltage will appear across the resistor in the plate circuit similar in wave form to, but greater in amplitude than, that impressed upon the grid. The device thus functions as an amplifier. The actual current flowing through the plate circuit, of course, comes from the "B" battery. For this reason, the action of the tube is sometimes likened to that of a valve in a water pipe, and in England, vacuum tubes are frequently called "Valves."

Various methods have been found for coupling one such vacuum tube amplifier to another so as to multiply the amplification effect. One of these is known as the "resistance-capacitance coupled" or "resistance coupled" amplifier. In this circuit, the plate of the first tube is connected to the grid of the succeeding tube through a condenser. A condenser, roughly speaking, is a device which permits the passage of alternating or other changing electric currents, but which will not permit the passage of a direct or continuous current. The grid of the second tube is thus isolated from the high positive voltage impressed on the plate of the first tube. A resistance is inserted in the plate circuit of the first tube. Another resistance is connected between the grid and the filament of the second tube, and the circuit is completed by a wire connecting the filament of the second tube to that of the first. This circuit was known and used in telephone and cable circuits for some time previous to the time when Nichols began his work on electrocardiographs.

In the patent in suit, two resistance-capacitance coupling circuits are employed in coupling together the three tubes used in the amplifier as shown.

An examination of the file-wrapper clearly indicates that, in the opinion of the Patent Office, the recording of the weak currents generated by the beat of the human heart was old; that the use of vacuum tubes in a resistance-capacitance coupled amplifier circuit to step up weak potentials was old, and that invention would not lie in applying old methods of tube amplification to the old art of electrocardiography. The application was finally allowed only after the attorneys of record asserted that aside from portability, the underlying features in the application were first, the use of condensers in the amplifier circuit to block the passage of direct currents, such as the skin currents, thus preventing their reaching the galvanometer, and only after they urged that the use of vacuum tubes eliminated the necessity of establishing a low resistance electrical contact with the body of the patient, because of the fact that the vacuum tube amplifier is a potential operated device.

As heretofore stated, some time in 1919, the plaintiff, Clyde H. Chase, a physician, interested Nichols in attempting to build an electrocardiograph, using a vacuum tube amplifier. This occurred some time in October, 1919. During November of that year, Nichols investigated existing electrocardiographs, and by December 1, had come to the conclusion that a vacuum tube amplifier and moving coil galvanometer should be used. His first formal drawing appears to have been made January 22, 1920. Experiments continued after the patent application was filed July 2, 1920. In 1922, Nichols exhibited a model instrument to physicians in Detroit. In 1923, he began to build five models definitely designed for clinical work. Three of these were finished and were used in making tests for a considerable period of time. In 1927, a company was formed to make this type of electrocardiograph, and the company built between sixty and seventy instruments. These were known as the Nichols Chase

electrocardiographs. The company subsequently ceased doing business, but the plaintiff Nichols has continued to service the machines sold and builds one or two machines a year on order.

The defendant asserts a number of defenses in its answer. In its brief, however, the defendant's principal contentions are, first, that it did not infringe this patent, and second, that regardless of infringement, this patent is invalid. It urges that the patent is invalid because it covers an inoperative structure in that the circuit as shown is unable to produce clinically satisfactory electrocardiograms. Invalidity is asserted also because the claims are anticipated by Western Electric prior invention and use, because they are anticipated by the prior invention and use of Dr. Alexander Forbes, and because the present patent involves no invention in the light of this and other work.

The defendant Sanborn Company was organized in 1923 and since that time has engaged in the manufacture of various supplies for physicians, including electrocardiographs. At first these were wholly of the string galvanometer type, including a portable model. Since some time in June, 1935, however, the defendant has sold on the market portable electrocardiographs of the amplifier type, utilizing a vacuum tube amplifier and a moving coil galvanometer. This machine was based on a particularly compact design, conceived by Dr. Hubert Mann and Mr. Patee, which was purchased by the defendant. It was and is sold under the trade-name "Cardiette." As first manufactured, it gave fairly satisfactory results, but not as satisfactory in some respects as the string machine because of a difficulty known as "beam decay", and because of radio frequency interference. "Beam decay" is a form of distortion introduced in the amplifier circuit because of the use of series coupling condensers as described above. It is due to the fact that the vacuum tube amplifier, of the type here involved, is designed to amplify changing potentials and consequently does not remain accurate as a recording device if the input is constant for more than a certain period of time. In order to be satisfactory for cardiography, the amplifier must not exhibit this form of distortion within the length of time necessary to record the heart potentials. As the result of further research, both of these defects in the first

"Cardiettes" were substantially eliminated, so that they now give results which compare favorably with those obtained from the string galvanometer. The difficulty with beam decay was met by the introduction of a corrective network, so designed as to counteract the distortion inevitably introduced by the rest of the amplifier circuit. See Miller, U. S. No. 2,180,160, a patent issued for this improvement. As a result of these improvements, and because the tube amplifier type of electrocardiograph, if it can be made accurate, does have the advantages claimed by Nichols in his patent application as described above, the defendant has now ceased to manufacture the string type electrocardiograph, although it still offers them for sale.

The circuit employed by the defendant's Cardiette, aside from the introduction of the corrective features just described, and the addition of the apparatus necessary for standardization and for putting time markings on the records, is similar to that shown in the plaintiffs' patent. So far as the arrangement and connection of the various components is concerned, there is only one difference of significance. This difference, on which defendant relies to meet the charge of infringement, lies in the insertion in the Cardiette of a blocking condenser between the patient and the grid of the first tube. The defendant urges that claim 2 is limited to "means within and forming a part of the amplifying circuit for suppressing all constant potential values delivered thereto", there referring to the coupling condenser between the first and the second tube; that claim 1 speaks of a "combined primary and amplifying circuit with the primary including selected portions of the living body;" that in the Cardiette, this condenser is placed in series with the human body in the lead to the grid of the first tube; and that this condenser must therefore be considered as in the primary circuit. As this condenser indubitably suppresses all constant potentials emanating from the human body, leaving none to be eliminated by the condenser between the first and second tube, it is argued that the Cardiette does not infringe because no suppression takes place within the amplifying circuit. But the real reason that this condenser is used in the defendant's present machine is that certain types of vacuum tubes have been placed on the market since the time of the patent, giving better results for certain purposes than those available at that

time. The characteristics of these more modern tubes are such that they require a very low fixed bias (the negative voltage supplied from the "C" battery or its equivalent), and one of these tubes is used as the first tube in the defendant's amplifier. With this tube, the skin current of the patient might become at times a substantial part of the operating bias, if allowed to reach the grid of the tube, thereby seriously effecting its amplifying properties. I find that this condenser was inserted to secure the proper operation as an amplifier of the first stage of the entire amplifier, and thus it must be regarded as a part of the amplifier circuit, within any fair meaning of the term. I further find that the suppression of constant potentials by the input condenser in the Cardiette is done in the same manner, with the exception only of the place where the suppression takes place, and by the same means, as are covered in the patent claims. Insofar as a question of fact is involved, I find that this difference in location of the first condenser which has the incidental effect of suppressing constant potentials is not sufficient to avoid a charge of infringement.

The defendant contends that the vacuum tube amplifier shown in the patent is not correctly designed for use in any electrocardiograph suitable for a physician in the course of his work. The evidence on this point was sharply conflicting. As heretofore indicated the specification for the patent in suit says in substance that certain enumerated values for the various resistors and condensers were found to produce good results. The plaintiff Nichols testified that they would produce good results. The defendant introduced a model constructed by one of its employees at its plant according to the teachings of the patent and using these enumerated values. It then introduced a number of cardiograms made with the model in evidence. I find, upon all the evidence, that these cardiograms were unsatisfactory for clinical purposes, and that in some instances, they were seriously misleading, producing from a normal individual a record indicative of a serious heart ailment.

Something here should be said about the plaintiff's explanation of the unsatisfactory character of these cardiograms. Though the patent fails to suggest what its impedance should be, the plaintiffs contend that the defects in the cardiograms produced by the defendant's model were due to a too low impedance in the galvanometer used. Whether the defective cardiograms were due, directly or indirectly, to the galvanometer's impedance, or not, the immediate cause was "beam decay", a difficulty previously described. In other words, the amplifier used in the model was unable to respond accurately to sufficiently low frequencies. If the values of the resistances and impedances in a circuit of this kind remain the same, and the capacity of the coupling condensers is increased, the response of the amplifier to low frequencies will be improved. In this connection, I find that in the commercial Nichols Chase machine made in 1927, and immediately thereafter, the coupling condensers had a capacity twenty times as large as those mentioned in the patent. The use of a galvanometer having a higher impedance, the values of all condensers remaining the same, would also improve the low frequency response of the amplifier. Since this would affect only one of a number of elements entering into the determination of the total distortion introduced by the amplifier at the frequencies in question, the selection of an improper galvanometer would not, of itself, be sufficient, in all probability, to explain the results obtained with the model adduced in evidence by the defendant. I cannot find that the unsatisfactoriness of the cardiograms produced on the model prepared by the defendant was caused by too low an impedance in the galvanometer which was used.

Upon all the evidence, I find also that an amplifier constructed with the values of capacity and resistance enumerated in the patent specification would not be satisfactory for use in an electrocardiograph to be used clinically by a practicing physician. I further find that by selecting proper values of condensers and resistors, different from such as the patent suggests, and using the amplifier circuit shown in the patent, a satisfactory cardiograph could be made.

The art of electrocardiography, the art of using vacuum tubes for purposes of amplification and the art of constructing moving coil galvanometers were all concededly old at the time Nichols first began his work. In addition vacuum tube amplifiers, of the resistance-capacitance coupled type had been used in connection with moving coil galvanometers in marine cable work. This work is much like electrocardiography from

an electrical viewpoint, since there is always a high constant current on a marine cable, and the signals are of low frequency.

The defendant relies in part upon two alleged instances of prior use or prior invention.

The first instance is certain work done by Dr. Alexander Forbes at the Harvard Medical School during the year 1919. Dr. Forbes was and is a distinguished member of the faculty at that school, specializing in electrophysiology, and the study of the electrical processes of living organisms. Some time in 1916, it was suggested to him that by using a vacuum tube amplifier with an Einthoven string galvanometer, it might be possible to record and study potentials in certain parts of the body which the galvanometer itself could not measure. Because of the World War, during which Dr. Forbes served in the Navy, working on radio gear, no steps were taken at that time to investigate the suggestion. After returning to the Harvard Medical School, however, Dr. Forbes began in March, 1919, to experiment with the use of a vacuum tube amplifier in connection with a string galvanometer. After experimenting with various circuits and components, he found that he could couple the galvanometer to the plate circuit of the tube through a resister in the plate circuit and a very large condenser, having a capacity of 15 microfarads. After adjusting the plate and grid potentials properly, and using this method of connecting the amplifier to the string galvanometer, he was able to obtain records substantially free from distortion. In order to check the reliability and freedom from distortion of the device, he made some electrocardiograms. Finding these satisfactory, he then regarded the apparatus as a usable tool for electro-physiological research and proceeded to use it as such. He found that among the advantages of his apparatus was that the constant potentials were prevented from effecting the galvanometer through the action of the tube and the output condenser. He found that a further advantage resulted from the fact that if the grid was at all times negative, the device was substantially a voltage operated one, and consequently the records were independent of the resistance of the input circuit. The apparatus was mounted on a table, as firmly as possible, and no attempt was made to make it portable. Dr. Forbes presented the results of his work along these lines in an address before the American Physiological Society in December, 1919. Subsequently he described it in an article sent to the publisher in April, 1920, and actually published in July, 1920.

The other instance of prior invention or use on which the defendant relies consists in work done in 1919 and early 1920 at the laboratories of the Western Electric Company in New York City by Dr. Vern O. Knudsen and Ralph E. Bitner, both of whom were at the time in the employ of that company as research engineers.

Sometime in January, 1919, Dr. Knudsen first constructed an amplifier to detect the physiological disturbances within a person such as heart pulses. He used a five-stage cable amplifier, all stages being resistance-capacitance coupled, and a student galvanometer. The five-stage cable amplifier was an amplifier developed for submarine cable work during the war by Western Electric. At first he found difficulty in using his amplifier because of stray noise interference. He worked on this problem. Later a form of moving coil recording galvanometer was used and permanent records made. Dr. Knudsen was accustomed to demonstrate this electrocardiograph to visitors permitted in the laboratories. In September, 1919, Dr. Knudsen left Western Electric, leaving several low frequency amplifiers in his laboratory. Subsequently Dr. Knudsen's work was continued by Ralph E. Bitner, who came into the company's employ in October, 1919. Bitner tried other types of amplifier. For the most part these were resistance-capacitance coupled throughout. He used either a siphon recorder, a form of moving coil galvanometer, or a string galvanometer. On February 18, 1920, he publicly demonstrated his five-stage low frequency amplifier, used with a string galvanometer, to some visiting members of the American Institute of Electrical Engineers. At times during this work at Western Electric a condenser was inserted in the input circuit leading to the grid of the first tube. At other times this condenser was omitted, and reliance was placed on the coupling condenser following the first tube to suppress constant potentials such as those caused by skin current.

The permanent records produced in these tests, when using a moving coil recording galvanometer, could be recognized as electrocardiographs by a practicing physician.

Since, however, they lacked the standardization or the time impulses of the standard electrocardiograph, they would not ordinarily have been useful clinically.

Insofar as any further question of fact is here involved, I find upon all the evidence and the foregoing subsidiary findings based thereon that all the claims of this patent are invalid in the light of the prior art, for lack of invention. If, however, any such claim should be deemed valid, I find insofar as upon this evidence and the foregoing subsidiary findings a question of fact is involved, that such claim is infringed by the defendant.

### Conclusions of Law.

1. Upon the basis of the foregoing subsidiary findings and the ultimate finding of invalidity of all claims contained in the patent, I conclude as a matter of law that the patent in its entirety is invalid in the light of the prior art for lack of invention.

It may not be amiss to state some of the reasons for the ultimate finding of fact and this conclusion of law as to invalidity of the patent.

Inventors are charged with a knowledge of what the art has done. Ruben Condenser Co. v. Copeland Refrigeration Corporation, 2 Cir., 85 F.2d 537; Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856; Duer v. Corbin Cabinet Lock Co., 149 U.S. 216, 13 S.Ct. 850, 37 L.Ed. 707; French v. Carter, 137 U.S. 239, 11 S.Ct. 90, 34 L. Ed. 664. In the present case, invention, if it is to be found, must lie in the adaptation of the resistance-coupled amplifier circuit to the problems of electrocardiography to produce new and useful results. In this case, while Dr. Forbes had not tried to design a portable electrocardiograph using an amplifier and a moving coil galvanometer, he had used a vacuum tube amplifier in connection with a string galvanometer. He had worked on the difficulty of avoiding distortion in the amplifier. He had found that when the galvanometer was coupled to the plate circuit through a condenser, the effect of skin current in overloading the galvanometer was avoided. He had found that when using a vacuum tube amplifier under conditions such that the grid remained negative at all times, the device was a voltage operated one, and hence not seriously affected by resistance at the point of contact to the patient. He had made electrocardiograms with the device which were good enough so that he felt that the amplifier was substantially free from distortion. It would not, in my opinion, have required more than ordinary skill to adapt his work to an electrocardiograph such as is shown in this patent. The same observation holds true of the work done in the Western Electric laboratory. There, in fact, resistance-coupled vacuum tube amplifiers of several stages had been employed in connection with a moving coil recording galvanometer. The incidental effect of keeping the skin current off the galvanometer was noted there. And no invention resides in merely making a device, otherwise old, portable. Hendy v. Golden State & Miners' Iron Works, 127 U.S. 370, 8 S. Ct. 1275, 32 L.Ed. 207.

While the facts as to the defenses of anticipation and lack of utility have been stated, I have deemed it unnecessary in the light of the conclusion as to invalidity for want of invention, to decide the respective merits of these defenses. See, however, as to lack of utility or operability, Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L. Ed. 112, and as to an infringer being estopped from denying utility, Kansas City Southern R. Co. v. Silica Products Co., 8 Cir., 48 F.2d 503.

2. Upon the basis of the foregoing subsidiary and ultimate findings of fact, I conclude as a matter of law that the four claims in suit, if valid, are infringed by the defendant.

Among the reasons for this conclusion, the following may be stated: The patent shows that the use of a condenser to couple the first tube of an amplifier to the second such tube also has the effect of cutting off all continuous currents present in the input to the amplifier and that such a circuit is advantageous in an electrocardiograph. The defendant uses an additional condenser at an earlier point in its amplifier, also for a purpose necessary to the proper operation of the amplifier. The fact that the defendant uses a condenser at an earlier point in the amplifier to accomplish the result described in the patent is, under the circumstances, insufficient to avoid the charge of infringement. The plaintiffs are entitled to a fair range of equivalents commensurate with the scope of their invention. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L. Ed. 1122.

Patent U. S. No. 1,888,139.
Findings of Fact.

This patent, which was issued to Horace E. Nichols, as inventor, November 15, 1932, upon an application filed July 16, 1928, purports to cover an interference eliminator for electrocardiographs. The invention, however, applies to similar apparatus as well as electrocardiographs.

Where a sensitive instrument such as an electrocardiograph is operated in the vicinity of an electrical field of sufficient strength, such as may exist near electric house wiring of the alternating current type, an interfering potential may be set up in the leads from the patient to the electrocardiograph. If the potential so induced is equal in each lead, the galvanometer is unaffected and no harm results. Where, however, as in an electrocardiograph, the leads are of different lengths and run to different parts of the patient, the interfering potentials so induced may well be unequal. In such case, the interfering potential will be recorded by the galvanometer and may render useless any records of heart action taken at the time. According to the teachings of the patent, this trouble is overcome by introducing to one terminal or the other of the galvanometer an additional interfering potential, in phase with that already present, and sufficient in amount so that the potentials at the two terminals of the galvanometer are equalized. This is accomplished by connecting a potentiometer across the input circuit of the electrocardiograph, and attaching the slider of the potentiometer to some collector of the interfering voltage, such as the body of the operator of the machine. A potentiometer as here used is a resistor so made that in addition to the wires leading to the two ends of the resistor, a third wire may be connected, by means of a movable slider, to any desired point on the resistor. All claims of the patent are in suit, but it has been agreed that the first claim may be regarded as typical. This claim reads: "1. In apparatus having an element responsive to changes in the difference of potential across its terminals, and wherein the terminals are subject to the activity of alternating potential interference, the method of eliminating such interference potential activity which consists in retaining the interfering potentials in the respective terminals and augmenting the potential values of the respective terminals from a collector independent of the terminals and subject to such interference potential and in regulated amounts such as to equalize the interfering potential value relationship between the terminals and establish an in-phase relationship there between."

The plaintiffs assert that the patent is infringed by the defendant's "portocardiograph". This is the portable model string galvanometer which was incidentally mentioned in connection with the other patent in suit. In this machine an interference eliminator is used. It also consists of a potentiometer connected across the input circuit of the cardiograph. In the defendant's machine, however, the slider is connected, not to a collector of the interfering potential, such as the body of the operator, but to ground. In practice, it is connected to some grounded object, such as a radiator. The methods by which these devices work are quite different from each other. The plaintiffs has already been described. In the defendant's eliminator, the potentiometer becomes a part of a bridge balancing circuit. By balancing both terminals of the galvanometer to ground, the defendant attempts to reduce the interfering potentials on both terminals in addition to equalizing them. This process was referred to as "draining off" of the interfering potentials.

The patent in suit is clearly for a method whereby the voltage on each terminal of the galvanometer is equalized by collecting some further amounts of the interfering potential and adding it to one terminal or the other. Obviously, this is not the object of the defendant's device. Insofar as any question of fact is here involved, I find no infringement by the defendant of U. S. Patent No. 1,888,139.

Conclusions of Law.

Upon all the evidence and the foregoing findings of fact based thereon, I conclude that U. S. Patent No. 1,888,139 is not infringed by the defendant.

In view of the invalidity of the first patent and the noninfringement of the second patent in suit, the bill of complaint is to be dismissed, with costs to neither party. Judgment to this effect may be entered.