ST. REGIS PAPER COMPANY,
Plaintiff,

v.

BEMIS COMPANY, INC., Defendant.

No. P–CIV–73–31.

United States District Court,
S. D. Illinois, N. D.

Nov. 12, 1975.

Raymond J. McElhannon, Clyde H. Haynes, New York City, Charles V. O'Hern, Jr., Peoria, Ill., for plaintiff.

Davis, Morgan & Witherell, Peoria, Ill., Irving Powers, St. Louis, Mo., for defendant.

## DECISION AND ORDER

ROBERT D. MORGAN, Chief Judge.

This cause arises upon a complaint, under the patent laws of the United States, 35 U.S.C. § 1 et seq., alleging patent infringement. The court has jurisdiction of the parties and of the subject matter under the provisions of 35 U.S.C. § 281 and 28 U.S.C. §§ 1331, 1332, 1338(a), 1391(c), 1400(b).

Plaintiff, a New York corporation, has its principal place of business in the city of New York. Defendant, a Missouri corporation, has a regularly established placed of business in Peoria, Illinois, within this judicial district. Both parties are manufacturers of paper and paper products, including multiwall bags of various types.

The complaint, as amended, is grounded upon three patents which are owned by the plaintiff: Lokey Patent No. 3,650,460, hereinafter Lokey, issued March 12, 1972, and Goodrich Reissue Patents numbered RE28,317 and RE 28,318, both issued January 28, 1975. These latter patents are hereinafter referred to, respectively, as the RE317 and RE318 patents.

### Historic Perspective of Present Status

The application, which ultimately ripened into the Lokey patent, was filed in the Patent Office on August 13, 1962. Co-pending with the Lokey application were an application of John J. Goodrich, numbered 169,287, filed January 29, 1962, and an application of one Harmsen, both asserting similar claims of invention. The examiner declared an interference between the three competing applications, as a result of which priority of invention was awarded to Lokey, and the Lokey patent was issued. The Goodrich and Harmsen applications were rejected.

In the meantime, a monologue of the Goodrich application was filed in France, and the same ripened into French Patent No. 1,345,471 which is owned by the plaintiff.

On June 28, 1965, an application by Mr. Goodrich and Chester E. Waxlax was filed in the Patent Office, which ultimately ripened into a patent to Goodrich and Waxlax, 3,687,356, hereinafter the 356 patent, issued August 29, 1972, and a second patent to the same, numbered 3,776,451, hereinafter the 451 patent, issued December 4, 1973. The application as originally filed contained a cross-reference stating that it was "a continuation in part" of the Goodrich 287 application. As the result of the Examiner's requirement that an election of species be made, the embodiment of figure 14 of the drawings was elected, which ultimately ripened into the 356 patent. A divisional application was then filed which ripened into the 451 patent. As a basis for allowance of those patents, the Examiner required that the cross-reference to the 287 application be deleted by amendment of the applications. That requirement rested upon his ruling that a joint application could not derive as a continuation in part from a previous sole application by one of the joint inventors. The reference was deleted in each instance.

Plaintiff's French Patent 471 was not cited as a prior art reference to the Goodrich-Waxlax application.

The original complaint herein alleged infringement of Lokey and the 356 and 451 patents.

Following extensive pre-trial discovery, preliminary proceedings, and pre-trial conferences, the cause was scheduled for a trial, upon the issues of validity and infringement of the three patents, to commence on February 11, 1974. In the course and context of such pre-trial proceedings, the defendant asserted plaintiff's 471 French patent as a prior art reference against both the 356 and 451 patents.

On the eve of trial in late January, the plaintiff filed a motion under 35 U.S.C. § 256, praying an order directing the Commissioner of Patents to correct the 356 and 451 patents by the deletion of Mr. Waxlax as a joint inventor from

each patent and the addition therein of a "continuation in part" reference to the Goodrich 287 application. That motion was denied on February 1, 1974. It was thereafter renewed and again denied at the outset of the trial.

At the close of the trial, the parties were directed by the court to submit proposed findings of fact and conclusions of law and their post-trial briefs. Such documents were filed during a period extending into the month of July, at which time the cause was taken under advisement by the court. In August 1974, plaintiff advised the court and opposing counsel, by letter, that it had filed an application in the Patent Office for reissue of the 356 and 451 patents, which said applications sought the deletion of Mr. Waxlax as a joint inventor and the restoration of the "continuation in part" reference to the Goodrich 287 application.

Prior to a decision, it became apparent that the patents would be reissued, and that the 356 and 451 patents would be superseded by reissue patents. A conference was then directed by the court, at which the plaintiff was granted leave to substitute those reissue patents when the same became available for the 356 and 451 patents. The parties were authorized to supplement the record pursuant to the demands of that changed situation and directed to submit revised findings and conclusions and such supplemental briefing as the premises were deemed to require.

The claims of each RE317 and RE318 patent are identical to those of the superseded 451 and 356 patents, respectively. The reissue patents differ from the original patents only in showing Goodrich, alone, as the inventor, and in reciting that the patents are issued upon an application which is a continuation in part of the 1962 Goodrich 287 application.

It seems apparent that both the Section 256 motion before this court and the subsequent reissue applications sprang from plaintiff's belated realization that its own French 471 patent might be a prior art reference against both the 356 and 451 patents, and that the same had not been cited during processing of the Goodrich-Waxlax applications. It is equally apparent that both the motion and reissue applications were designed to recapture the "continuation-in-part" cross reference to the Goodrich 287 application and an effective filing date of January 29, 1962, for the applications as thus revised.

The cause, in present posture, is grounded on Lokey, RE317 and RE318.

### The Patents in Suit

Each patent relates to a paper bag-type, which is designated by the trade as a gusseted, multiwall, pinch-bottom, open-mouth bag.

Lokey relates to a bag of that type comprised of several contiguous plies of flexible material, such as paper, in tubular form, with, at its open end, a front wall, and a rear wall portion which is designed, in closing the bag, to overlap the front wall. The bag is longitudinally and reversely creased along diametrically opposed portions to provide a pair of gussets between the front and rear walls. Each of those gussets has a front wall which is cut above, or stepped up from, the plane of the front wall, and a rear portion which is stepped upward above the front portion thereof. The rear bag wall is, in turn, stepped upward above the rear gusset portions. The exposed overlap portion of the rear wall and of the gussets are coated with an adhesive for sealing such portions against the front wall after the bag has been filled with a bulk commodity. The construction of the closed bag end is complementary to that of the open end, and the same is folded over and sealed against the rear wall as a part of the process of manufacture of the bag.[1]

---

1. Claim 2, the broadest claim of Lokey, recites:

"2. A bag of tubular form comprising a plurality of contiguous plies of flexible sheet material, said bag having a front surface and an oppositely disposed rear surface adapted to overlap said front surface at one end of said tube when said bag is in its assembled

Patent RE317 combines with the Lokey end construction the further feature that at least some of the several bag plies are stepped upward relative to each other in the front and rear walls of the bag ends.[2] The patent RE318 claims

add to the Lokey RE317 composite structure the further features that the several bag plies also stepped upward, the one above the other, in the gusset portions of the bag.[3]

condition, said bag being longitudinally and reversely creased along diametrically opposed portions to provide a pair of oppositely disposed gussets interposed between said front and rear surfaces, each of said gussets having a front portion and a stepped rear portion adapted to overlap said front portion within the overlap area of said front and rear surfaces at said end of the tube when said bag is in its assembled condition, the longitudinal edges of said plies being successively and progressively stepped with the respective longitudinal edges of each ply being adherently bonded one to other in overlapped relation, and said end of the tube including all of said overlapped portions and surfaces being folded against said front surface and selectively adhered in position to form said assembled bag end."

A more specific definition is contained in Claim 5, as follows: "5. A gusseted multiwall bag formed from a continuous tube of plies of flexible sheet material, comprising: a tubular body composed of a plurality of said plies, the longitudinal edges of said plies being successively and progressively stepped with the respective longitudinal edges of each ply being adherently bonded one to the other in overlapped relation, said tubular body being reversely creased along diametrically opposed portions to provide front and rear walls and a pair of gussets interposed therebetween on opposite sides of the axis of said tubular body, respectively, a first end structure including for each said gusset, said front wall, a first gusset wall longitudinally connected to said front wall along a first longitudinal edge, a second gusset wall longitudinally connected to said first gusset wall along a second longitudinal ⸱ edge, and said rear wall longitudinally connected to said second gusset wall along a third longitudinal edge, all of the plies in the front wall being cut perpendicularly to and along the first longitudinal edge of each gusset to expose the upper portion of the first gusset wall thereof and form a first step, all of the plies in the first gusset wall of each gusset being cut perpendicularly to and along the second longitudinal edge to expose the upper portion of the second gusset wall thereof and form a second step, all of the plies in the second gusset wall of each gusset being cut perpendicularly to and along the third longitudinal edge to expose the upper portion of the rear wall and form a third step, and said adherently

bonded and overlapped longitudinal edges of said plies being disposed between said pair of oppositely disposed gussets, said end structure including all of said exposed upper portions being folded against said front wall and adhesively secured thereto, and a second end structure similar to the reverse of the first end structure."

2. The broadest claim, Claim 1, is in the following language: "1. A bag of tubular form comprising a plurality of at least three contiguous plies of flexible sheet material, said bag having a front surface and an oppositely disposed rear surface adapted to overlap said front surface at one end of said tube when said bag is in its assembled condition, said bag being longitudinally and reversely creased along diametrically opposed portions to provide a pair of oppositely disposed gussets interposed between said front and rear surfaces, each of said gussets having an exposed front portion and an exposed rear portion which is stepped above said front portion and adapted to overlap said front portion within the overlapped area of said front and rear surfaces at said end of the tube when said bag is in its assembled condition, at least some of the bag plies being stepped in said front and rear surface portions to provide exposed portions thereof, a heat reactive bonding agent in a dormant state substantially covering said exposed gusset portions and front and rear surface portions at said end of the tube when said bag is in its assembled condition, and said bonding agent being reactivatable to close said bag end, the opposite end of said tube being folded over and adhered to a surface of said tube by means of said bonding agent."

3. The broadest claim, Claim 1, is in the following language: "1. A bag of tubular form comprising a plurality of contiguous plies of flexible sheet material, said bag having a front surface and an oppositely disposed rear surface adapted to overlap said front surface at one end of said tube when said bag is in its assembled condition, said bag being longitudinally and reversely creased along diametrically opposed portions to provide a pair of oppositely disposed gussets interposed between said front and rear surfaces, each of said gussets having a front portion and a stepped rear portion adapted to overlap said front surface within the

The object of the several patents is best defined with relation to the problems sought thereby to be solved. Bag types in use prior to the Lokey concept were susceptible of excessive sifting of dry contents therefrom, the introduction of moisture thereinto, and insect penetration through the sealed portions at either end of the bag. Lokey was designed to achieve a high-strength end-closure construction, having greatly superior sift-proof properties and moisture and insect penetration resistance. The evidence is compatible only with the finding that the invention claimed in Lokey did substantially achieve that object. The structures claimed in RE317 and RE318 do achieve sift, moisture and inset-proof qualities which are substantially enhanced over those bags of the Lokey construction.

Plaintiff alleges that defendant has infringed the claims of each of those patents. Defendant denies infringement in each instance. It further defends upon its contention that each patent is invalid for divers reasons as hereinafter noted and discussed.

### Infringement

Certain stipulations of the parties must be construed as an admission by the defendant that it has been manufacturing and marketing bags within this judicial district, which are embraced by the context of Lokey claims 1, 2, 4 and 5. Plaintiff's expert witness testified that bags manufactured by defendant, as exemplified by plaintiff's exhibits 1, 2, 4, 6, 8–10, inclusive, 13–19, inclusive, and 22, do infringe each of claims 1, 2, 4 and 5 of Lokey. That testimony stands not only undisputed, but, also, corroborated by a comparison of those several exhibits with the Lokey claims.

Consideration of the relevant evidence requires the finding that defendant's

overlap area of said front and rear surfaces at said end of the tube when said bag is in its assembled condition, and with the bag plies extending progressively and successively one beyond another at each surface portion and each gusset portion of said bag end,

bags, as exemplified by plaintiff's exhibits 4, 6, 10 and 17, do infringe claim 1 of RE318, and that certain among said exemplifications show infringement of one or more of the more restrictive claims 2, 3 and 4 of the patent.

The court also finds that defendant's bags, as exemplified by plaintiff's exhibits 1, 2, 4, 6, 8–10, 13–19, and 22, do embody the inventive concept of claim 1 of RE317, and that certain among such exhibits would also infringe the more restrictive claims 2, 3 and 4 thereof.

Defendant urges that infringement of RE317 (formerly the 451 patent) cannot be found, inasmuch as that patent did not issue until December 4, 1973, and the exhibit evidence reflects production runs by defendant prior to the issuance of that patent. It is axiomatic that a patent cannot be infringed until the same has issued, and that no damages can therefore accrue. That fact does not preclude the present determination that certain exemplified structures do embody the teachings of the claims, or the conclusion that the plaintiff is entitled to redress, by accounting or otherwise, for infringing units manufactured subsequent to the issue date of the patent. That is a matter which may be resolved when and if this suit reaches an accounting stage.

The testimony of defendant's patent expert, that none of the accused bags infringes patent 451 (now RE317) because none have adhesive substantially covering the front surfaces of the ends, must be viewed as a semantic perversion of the language of the patent claims. Such credit, to which his opinion might otherwise be entitled, is diluted by testimony of defendant's technical expert witnesses that certain of the exemplified bags do embody every element of generic claim 1 of the patent.

and a bonding agent in a dormant state being applied on each surface portion and each gusset portion at said bag end, and said bonding agent being reactivatable to close said bag subsequent to a later bag filling operation."

If valid, the court finds that the several patents are infringed in manner and extent as above delineated.

### Validity

■ Validity of each patent in suit must be judged by the particular circumstances surrounding its issuance, but basic cardinal principles, which seem hardly necessary to restate, do apply to all. Foremost among such principles is the presumption created by 35 U.S.C. § 282 that an issued patent is valid, and the corollary principle that that presumption is strengthened when the principal prior art relied upon to prove invalidity has been considered and rejected by the Patent Examiner. *E. g., Reese v. Elkhart Welding & Boiler Works, Inc.,* 447 F.2d 517 (7th Cir. 1971). The presumption cannot be overcome if the prior art upon which reliance is placed is less pertinent or has no greater pertinency than the art which the Examiner rejected in his allowance of the patent in suit. *LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.,* 445 F.2d 84 (7th Cir. 1971); *Uarco, Inc. v. Moore Business Forms, Inc.,* 440 F.2d 580 (7th Cir. 1971), *cert. dismissed,* 404 U.S. 873, 92 S.Ct. 91, 30 L.Ed.2d 117. Finally, each patent in suit is governed by the cardinal principle that a party asserting invalidity can overcome the statutory presumption only by clear and convincing proof of invalidity. *E. g., Mercantile National Bank of Chicago v. Quest, Inc.,* 431 F.2d 261 (7th Cir. 1970), *cert. denied,* 401 U.S. 956, 91 S.Ct. 977, 28 L. Ed.2d 239. Though it be necessary to consider defendant's contentions as against each of these patents separately, those basic principles implicitly guide the ultimate decision in each instance.

### Validity of Lokey

Against Lokey, defendant asserts two defenses: first, that the subject of claimed invention would have been obvious to persons skilled in the art when the claimed invention was made within the meaning and intendment of 35 U.S. C. § 103; and, second, that Lokey is invalid because of misrepresentations made in the Patent Office related to the prior art.

In support of its Section 103 defense, defendant relies upon seven patents, including patents to Single, Poppe & Schenke,[4] which, it argues, make the Lokey concept obvious.

Digressing, historically, when the interference was declared, the Examiner directed Mr. Lokey to amend his application by copying thereinto claim 11 of the Goodrich application, and directed Mr. Goodrich to amend in like fashion by copying into his application claim 8 of the Lokey application. Those claims, revised in accordance with the Examiner's direction, were then allowed and the same became counts 1 and 2 of the interference. Ultimately, those claims were allowed as claims 1 and 2 of Lokey.

During the course of that interference, the party Lokey moved to dissolve Count 1 thereof as unpatentable over the prior art, specifically the prior art patent to Poppe. The party Goodrich opposed that motion. In rejecting the Lokey contention for dismissal, the Primary Examiner said, as to Count 1:

"* * * the multiwall feature recited in Count 1 is patentable over Poppe since the Multiwall feature is the crux of the common invention at issue and is not shown in any of the references."

The Examiner also observed that Poppe was cumulative only, adding nothing to the disclosure of the patent to Single which had been considered by the Examiner in setting up the interference.

In rejecting the motion to dissolve Count 2, on the ground that the subject matter was unpatentable over Schenck,

4. J. Single 426,607
 H. Haskell 1,983,291
 G. W. Poppe 2,209,901
 T. M. Avery 2,312,280
 E. D. Abramson 2,316,385
 A. E. Schenck 2,582,286
 St. Regis, French 680,925

the Primary Examiner said, in part: "The gussets in the Schenck patent do not have a front portion and a stepped rear portion as called for in Count 2."

Further, referring to an affidavit by one Woronoff, related to comparative tests conducted with bags constructed pursuant to Schenck and bags constructed under the Lokey concept, he said:

"[Bags constructed per Schenck] were completely unsatisfactory due to the fact that the two steps did not provide adequate sealing surface, whereas the three steps in the Lokey bag * * *, are adapted to the application of enough positive pressure to tightly seal the end closure to prevent sifting because the flaps of the back and each side of the gusset are sufficiently bonded to the front in closure to prevent their loosening by vibration."

The Examiner determined that the Lokey claims were patentable over the Poppe, Single, Haskel and Schenck prior art references. That expert appraisal must be honored by the court in the absence of persuasive evidence that the Examiner's decision was wrong. *E. g., Hazeltine Research, Inc. v. Avco Mfg. Corp.*, 227 F.2d 137, 146 (7th Cir. 1955), *cert. denied*, 350 U.S. 987, 76 S. Ct. 474, 100 L.Ed. 854. Other references upon which defendant here relies are not only no more pertinent than are Poppe, etc., but defendant's own technical experts admitted in their testimony that bags made pursuant to such prior art patents were inoperative to achieve a sift-proof seal.

Perhaps this issue does epitomize the reason for recognition of the patent examiner's expertise, and the necessity for avoidance of the use of hindsight to determine what was or was not obvious. Defendant's references do create an impression of superficial obviousness which might persuade the uninitiated person to conclude that Lokey achieved nothing of patentable stature. Yet the Examiner looked past and through that superficiality and recognized that Lokey did embody an inventive concept which achieved a result for which practitioners in the art had theretofore striven in vain.

There is in the record no dispute that prior to 1962 the bag industry was substantially foreclosed from the market related to containers for various commodities. That was true because the industry had devised no workable means to securely seal the bag ends to avoid the sifting of their contents therefrom. Practice of teachings of the prior art references failed to achieve the desired result. It is clear that Lokey provided the answer to that long felt need, and that his concept met with substantial commercial success. In 1962, the market for gusseted, multiwall, open-mouth bags was limited. Beginning in 1962, with the advent of the Lokey concept, that market achieved substantial increase. Sales of such bags in 1972 by the industry totaled approximately 110 million bags. That overall picture buttresses the Examiner's determination that what Lokey claimed was not obvious. *E. g., Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.*, 436 F.2d 1180, 1187 (7th Cir. 1971), *cert. dismissed*, 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722.

Defendant's contention that Lokey is rendered invalid because of alleged misrepresentations made in the Patent Office to obtain its allowance stands equally unsubstantiated upon this record. To place that contention in proper perspective, it is noted that no question is raised as to any representation made by the party Lokey. The contention rests upon the claimed effect of certain representations made in support of the copending application of Goodrich.

The issue might be disposed of upon the principle applied in *Noll v. O. M. Scott & Sons*, 467 F.2d 295 (6th Cir. 1972), *cert. denied*, 411 U.S. 965, 93 S. Ct. 2143, 36 L.Ed.2d 685, that a false representation can be relied on to in-

validate a patent only if the representation was made as to the application upon which the patent issued. In view of defendant's earnest contention that the Examiner was misled, with the result that Lokey was allowed, the merit of the contention is considered.

The contention rests upon three statements taken from the context of the prosecution of Goodrich 287 and the file of the interference which devolved as an adjunct thereto.

The first excerpt is taken from an amendment filed on behalf of Goodrich, which stated:

"It will be appreciated that the Single patent was issued over 63 years ago and during that long period of time the combination of a multi-ply bag with gussets has remained unknown, and therefore, a multi-ply bag with stepped gussets certainly does not appear to be an obvious combination."

Defendant contends that that statement is a misrepresentation, in view of plaintiff's statement in its answers to interrogatories that it had sold gusseted, multiwall bags in the United States since the early 1930's. However, there was no inquiry in interrogatories as to the particular construction embodied in such bags. Further reference to plaintiff's answers to interrogatories places the issue in perspective. Plaintiff stated that it first sold pinch bottom bags in 1962, and that its first sale of gusseted, pinch bottom, open mouth bags was in April, 1962.

When read in the context of the issue facing the Patent Examiner in 1963, the Single reference cannot be construed as a misrepresentation. The Goodrich application related to bags of multiwall, stepped gusset, pinch bottom construction. The quoted statement urged patentability of that construction over the single ply, stepped gusset, pinch bottom bag of Single. It was wholly immaterial that multiwall, gusseted bags of an entirely different construction were theretofore known. Moreover, when the Patent files are read as a whole, it is readily apparent that the Examiner had before him references and information that such bags were old in the art. It would deny credibility to assume that the Examiner did rely upon a misstatement of counsel in a co-pending file, and ignore other information before him, in reaching his determination that Lokey was patentable over the prior art.

Other misrepresentations alleged to have been made are:

"The Schenck patent 2,582,286 shows only a single ply construction and hence cannot have successively and progressively stepped longitudinal edges bonded one to the other in overlapped relation and disposed between a pair of oppositely disposed gussets."

a. A statement on behalf of Goodrich, filed November 23, 1965, that:

b. A statement on behalf of Goodrich, in opposition to Lokey's motion to dissolve the interference, that "it will be appreciated that Schenck merely shows a single walled bag."

The quoted statements are taken out of a larger context, with the result that their intendment becomes somewhat distorted. Moreover, it is not seen that these statements could have misled or influenced the Examiner when they are viewed in the historical context of the Patent Office proceedings. The same examiner was assigned to both the Goodrich and Lokey applications. He rejected the Lokey claims as unpatentable over Schenck. Mr. Lokey responded with the affidavit of Woronoff, which summarized test results achieved with bags of Schenck construction as compared to bags embodying the Lokey concept. The Examiner, on the strength of that affidavit, noticed Mr. Lokey to copy a claim comprising the elements of claim 11 of the Goodrich application and Goodrich to copy a claim comprising the elements of claim 8 of the Lokey application for interference purposes. Those claims were then allowed and the interference declared, upon facts then apparent which the Examiner deemed suffi-

cient to distinguish Schenck from the structures embodied in those claims.

■ To sustain this defense, defendant has the burden of proving that the representations upon which it relies were false and were made fraudulently and with deceptive intent. *E. g., Armour & Company v. Wilson & Company,* 274 F.2d 143, 148 (7th Cir. 1960); *Ransburg Electro-Coating Corp. v. Nordson Corp.,* 293 F.Supp. 448 (N.D. Ill.1968). It is questionable whether any such statement was a misrepresentation when the same is considered in context. It is certain that the requisite intent is not proved.

The court finds and concludes that Lokey Patent No. 3,650,460 is valid.

### The RE317 and RE318 Patents

Two procedural arguments are dealt with before reaching the substance of the defendant's reliance upon its contentions of invalidity of the patents.

At the outset, the defendant urges the position that the court, in denying plaintiff's motion under 35 U.S.C. § 256, for an order directing the Commissioner to correct the 356 and 451 patents by deleting the name of Mr. Waxlax from each as a joint inventor and by adding to each a "continuation-in-part" reference to the Goodrich 287 application, determined that plaintiff was not entitled to revision of those patents in the manner requested. That position is then asserted as a basis for argument that RE317 and RE318 are not validly issued for the reason that the action of the Patent Office granting reissue fatally conflicts with this court's prior decision related to the Section 256 motion.

It is clear that defendant reads too much into the court's orders denying the Section 256 motion. The historic perspective of that motion as above recited is not repeated here, except to reiterate that the motion was filed on the very eve of the date set for trial.

■ There can be no question that a court is empowered by Section 256 to direct the correction of inventorship in a proper case,[5] and for present purposes it is assumed, without so deciding, that this court would have had the power to order correction of these patents to encompass the total context of the prayer of that motion. Thus, the only issue is the question whether the orders entered constitute a ruling upon the merits of the prayer for relief therein contained. The orders cannot be so construed. The motion was grounded upon the allegation that plaintiff had just then discovered that Mr. Waxlax had not contributed to the inventive concepts embodied in the 356 and 451 claims.[6]

The court's ruling did not relate to the merits of the motion. It was apparent that the motion would interject into the cause new issues related to the factual accuracy of plaintiff's contentions and to plaintiff's good faith in the premises. It was equally apparent that interjection of new issues into the case on the eve of trial opened the door for the need of further and perhaps extensive additional discovery. It was further apparent that those considerations would undo the efforts of all concerned, theretofore devoted to the definition of the issues presented and to scheduling the rather extensive time required for the trial thereof.

---

5. The third paragraph of Section 256 provides, in pertinent part: "The misjoinder or nonjoinder of joint inventors shall not invalidate a patent, if such error can be corrected as provided in this section [by showing that the omission or misjoinder resulted from error 'without any deceptive intention']. The court before which such matter is called in question may order correction of the patent * * * "

6. The record does reflect testimony by Mr. Waxlax that he had just discovered about January 14, 1974, that no part of the claimed inventive matter which he had contributed to the application, as reflected in drawings and specifications therein, had been allowed and embodied in the claims of the patents. Certain testimony of Goodrich is corroborative of Waxlax.

The court entered its order denying the motion upon those considerations. The orders cannot be construed as a ruling upon the merits of the factual allegations asserted in the motion, since the court did not have before it the evidentiary material upon which the merits could then be weighed and determined. The orders neither precluded the plaintiff's filing of the application for reissue nor the Commissioner's power to consider those applications.

It is next contended by defendant that the reissue statute, 35 U.S.C. § 251, does not authorize the reissue of a patent to achieve a change of inventorship. That contention begs the real issue with which this court is faced. No court decision is found in which this question has been litigated, though the position of the Patent Office, as reflected in *Ex parte Scudder*, 169 U.S.P.Q. 814 (Bd. App.1971), is that the reissue section is properly employed to effect a change in inventorship.

A literal reading of Section 251 would seem to exclude an error in inventorship from the reach of the statute.[7] At least a cogent argument can be made for the premise that Section 256 provides a means and machinery for correction of errors in inventorship, and that there is no reason to approach that subject through the reissue procedures authorized by Section 251. In the factual context of this litigation, it is not necessary to consider that question, and nothing stated herein is intended to express any opinion by this court related to the proper application of Section 251 to that issue.

In the present factual context, the applications for reissue involved both a correction of inventorship and the insertion of a "continuation-in-part" reference which would entitle the plaintiff to a 1962 effective filing date for its patent application.

In the light of those circumstances, the critical issue becomes a question whether the statute is to be strictly construed as limiting reissue to correction of "defective" specifications or drawings, or to correction of an inadvertently drawn claim of invention "claiming more or less" than the inventor was entitled to claim, or whether it is to be liberally construed to authorize reissue to define the rights of a patentee which were either too strictly or too broadly stated through inadvertence and without any deceptive intention.

A somewhat analogous question was before the court in *State of Israel v. Brenner*, 273 F.Supp. 714 (D.C.D.C. 1967), aff'd, 130 U.S.App.D.C. 318, 400 F.2d 789 (1968). The patentee, in obtaining a U.S. patent, had failed to file with its application a certified copy of an earlier analogous, foreign application. It then filed an application under Section 251 for a reissue to correct that deficiency and thereby obtain the priority of the earlier filing date of the foreign application under the provisions of 35 U.S.C. § 119. Against the contention that Section 251 restricted reissue to the office of correcting errors in specifications, drawings, or the claims of invention only, the court said that the statute must be liberally construed. It held that the statute did authorize the reissue of a patent to correct a claim to a right of priority which inadvertently, and without deceptive intent, had not been asserted in the original application. 273 F.Supp. at 717.

Justice and reason support the result reached in *Brenner*, that reissue

---

7. That section provides in part: "Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue."

for the correction of "claims" is not limited solely to the claims of invention.[8] It encompasses, as well, all claims of rights and priority to which the patentee would have been entitled had there not been inadvertent omission in his original application. Literal construction of a statute, in abjuration of reason and blind indifference to the ends of justice, is an untenable result in American jurisprudence. *Sorrells v. United States*, 287 U.S. 435, 446, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

 This plaintiff, with sole inventorship in Goodrich, would have been entitled to retain the 'continuation-in-part" reference and the priority of the 1962 filing date of the Goodrich 287 application. The court holds that the Patent Office correctly applied Section 251 to permit reissue under those circumstances.

### Validity of RE317 and RE318

These reissue patents have the same effect as if the patents had originally issued in their amended form, and to the extent that the reissue claims are identical to the original claims, the reissue patents are a continuation of the original patents from the date of such originals. Reissue does not affect any action pending at the time of reissue, and the same shall proceed as if the patents had originally issued in their amended form. 35 U.S.C. § 252.

In following context, two contentions against RE317 only are first treated, followed by exposition related to both RE317 and RE318, generically.

### Contentions Limited to RE317

It is first contended that RE317 (original 451 patent) is invalid as constituting double patenting in view of RE318 (original 356 patent). That argument borders on the specious.

 The Examiner determined that the original application embodied more than one invention and required an election among species. The species elected was embodied in the 356 patent. A divisional application was then filed embodying other inventive concepts contained in the original application and the same was allowed as the 451 patent. That procedure was in all respects in compliance with the provisions of 35 U.S.C. § 121. It must be presumed that the Examiner resolved any question of double patenting when he allowed the divisional application, absent clear and convincing proof to overcome that presumption. *TSC Industries, Inc. v. International Harvester Co.*, 406 F.2d 53, 57 (7th Cir. 1968).[9] There is absent any proof in this transcript to sustain the contention.

 The second excepted contention, that the claims of RE317 are indefinite within the meaning of 35 U.S.C. § 112, is equally without merit. That section requires that a claim embody sufficient specificity to permit persons skilled in the art to understand and practice the teachings of the claim. Defendant's proof against the presumption that the Examiner did determine that the patent claims do comply with Section 112 is limited to assertions of its patent expert. In essence, that witness, a patent attorney, stated that he could not understand what was being claimed in that portion of claim related to a bonding agent "substantially covering" the exposed gusset portions and front and rear wall surface portions, in the light of drawings indicative that such agent was applied to only a part of such exposed portions of the bag end. Yet,

---

8. The reissue section is "remedial in intent" and must be construed liberally. *Hickory Springs Mfg. Co. v. Fredman Bros. Furniture Co.*, 509 F.2d 55 (7th Cir. 1975).

9. In fact, this issue might be treated as moot. In its reissue application, which led to issuance of RE317, plaintiff filed a terminal disclaimer, consenting that the monopoly of the 451 patent (now RE317) terminate on the date of termination of the 356 patent. That disclaimer, in effect, removes any issue of double patenting from the cause.

none of defendant's technical experts, who were skilled in the bag art, professed any problem in understanding the inventive concept claimed, or in applying it to the practical art of producing bags. When read in the context of the total structure described in the patent, these claims are seen to be sufficiently definite to comply with the requirements of Section 112. *Canaan Products, Inc. v. Edward Don & Co.*, 388 F.2d 540 (7th Cir. 1968).

### Contentions Against Validity of Both RE317 and RE318

Defendant's arguments are addressed to the validity of the claims in the light of the total history of Patent Office proceedings, which led, successively, to the grant of the original patents and the reissue patents, and to contentions directed against the reissue patents alone.

In the first context, argument is bifurcated, contending for the necessity of first determining whether the original claims were invalid under 35 U.S.C. § 102(b), because the same were anticipated by plaintiff's French 471 patent, before proceeding to the broader issue related to the validity of the reissue claims. That argument seems to be compelled by the effect of the fact of reissue.

▮ Under Section 252 the reissue patents constitute a continuation of the original patents which they, respectively, supersede, with effective dates identical to those of the original applications. As previously noted, each is identical to its original counterpart, with the exception that Goodrich is named as the sole inventor in each, and each reissue patent is cross-referenced as a continuation-in-part of Goodrich's 287 application, filed January 29, 1962. Thus, each of these reissue patents has as an effective filing date, the filing date of the 287 application as to all common subject matter. 35 U.S.C. §§ 120, 252; *Technicon In-*

struments Corp. v. Coleman Instruments Corp., 385 F.2d 391 (7th Cir. 1967). Plaintiff occupies the same position as if the continuation-in-part references had never been deleted from the original applications. *Sticker Industrial Supply Corp. v. Blaw-Knox Co.*, 321 F.Supp. 876 (N.D.Ill.1970).

Though it be recognized that there existed cogent argument against the 356 and 451 patents with reference to said French patent,[10] the latter patent is no longer available as a reference against the reissue patents in suit. The similarity between the current factual situation and that of *Sticker, supra,* is noted. In that litigation the original patent was held to be invalid because of the patentee's prior public use of the claimed invention. *Sticker Industrial Supply Corp. v. Blaw-Knox Co.*, 405 F.2d 90 (7th Cir. 1968). Thereafter, the patentee obtained a reissue patent incorporating a cross-reference to another patent application which antedated such prior use. In sustaining the reissue patent, the District Court held that the reissue restored the patentee to the position which actually existed on the date of the original patent and obviated the prior use bar. 321 F.Supp. at 879.

Pertinent to this context is the defendant's further argument that a patentee, by reissue, may not recapture "subject matter" which was voluntarily abandoned in response to a Patent Office rejection of an original application. However, that argument is diluted by the necessity of defendant's own admission that its reliance is based upon precedents related to the attempted recapture of patent claims which had been abandoned to obtain issuance of the original patent. *E. g., Altoona Publix Theatres v. American Tri-Ergon Corp.*, 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005 (1935); *Tee-Pak, Inc. v. St. Regis Paper Co.*, 491 F.2d 1193 (6th Cir. 1974).

The instant suit does not deal with abandonment of a substantive, inventive

---

10. *Cf., Frantz Mfg. Co. v. Phenix Mfg. Co.*, 457 F.2d 314, 320–322 (7th Cir. 1972); *Mil-* ton Mfg. Co., Inc. v. Potter-Weil Corp., 327 F.2d 437, 440–441 (7th Cir. 1964).

claim. What is involved is the claimed right of restoration to a priority as to the inventive embodiment of the original patents. The issue before us cannot be realistically distinguished from the factual background of the decisions in *Sticker v. Blaw-Knox* and *State of Israel v. Brenner, supra.* Plaintiff's restoration to a right of priority which the Examiner has approved does not expand the inventive monopoly claimed.

■ It is not deemed necessary now to determine whether, but for the fact of reissue, the original patents would have been invalid over the French 471 reference. The effect of reissue is to accord to the patents an effective filing date which antedates publication of that French patent, and to negate that patent as a potential defense against the patents in suit, even if otherwise it would have rendered them invalid.

What has been hereinabove said in the Lokey context effectively disposes of defendant's contention of obviousness under 35 U.S.C. § 103. With the exception of the French 471 patent, the prior art introduced in evidence against these patents was the same as that upon which reliance was placed to defeat Lokey. In the present posture of this file, all such prior art, as well as Lokey and plaintiff's said French patent, was before the Examiner when the reissue patents were allowed.

There remains for consideration the several contentions of the defendant based upon a claimed estoppel, and to claims of wilful concealment by plaintiff of its French patent from the Patent Office, and of its having made false representations in both the original and reissue proceedings before the Patent Office.

■ The estoppel argument rests upon the contention that plaintiff is estopped from relying upon the original Goodrich 287 filing date by reason of the inconsistent positions which it has taken before this court and before the Patent Office. In that context, defendant quotes statements from plaintiff's

original brief that the 471 French patent does not disclose "the inventive combination" claimed in the first claim of each the 356 and 451 patents. In counterpoint, it summarizes statements made to the Patent Office in conjunction with the reissue applications that the inventions claimed in the reissue patents are substantially disclosed in the original Goodrich application. Ergo, it is contended that plaintiff is estopped from relying upon the continuation-in-part reference and also estopped from denying that its patents are invalid over its French 471 patent.

That rather tortured reasoning overlooks one salient fact. The quoted statements taken from plaintiff's original brief state only that the French 471 patent does not disclose the totality of the inventive combination claimed in the original patents. Plaintiff's claims in the Patent Office, with reference to the disclosures of Goodrich 287, merely stated its position that prior application contained generic disclosures which embraced the subject matter of the 356 and 451 patents, although the latter also disclosed and claimed patentable improvements. The estoppel theory, though novel, must be rejected. Plaintiff is entitled to its filing date of January 29, 1962, as to all common subject matter in the two applications. *Application of Grimme*, 274 F.2d 949, 47 CCPA 785 (1960).

■ It seems to this court that there are two abiding principles applicable to the whole plethora of contentions that the Examiner was misled in the prosecution for both the original applications and the reissue applications. The first is that the presumption of validity which attaches to actions by the Patent Office not only recognizes the expertise of Examiners, but also assumes that those persons are possessed of a reasonable intellectual capacity, and that they apply both their expertise and intellect in reaching their decisions. The second is that misrepresentations which will bar validity of a patent must be

proved by clear and cogent evidence, not by the eloquence of counsel.

To sustain its contentions of misrepresentations, defendant has the burden of proving that plaintiff was possessed of knowledge of the facts and that it did intentionally misrepresent or conceal such facts from the Patent Office. *E. g., National Dairy Prod. Corp. v. Borden Co.*, 394 F.2d 887 (7th Cir. 1968), *cert. denied,* 393 U.S. 953, 89 S.Ct. 378, 21 L. Ed.2d 364.

 Related to defendant's contention that there was fraudulent concealment by plaintiff of the French patent upon prosecution of its original application, there is no credible evidence as to the publication date of that patent. There is no evidence that plaintiff had knowledge of its publication at that critical time. Indeed, the only record evidence as to plaintiff's knowledge is its statements in interrogatories that its records do not reflect the date of publication of the patent; that the stated date, "March 9, 1964," contained in its statement as to pertinent prior art in the reissue file wrapper, was information "only by hearsay," and that it has no information other than hearsay as to the correct publication date thereof.

In that context, upon the trial of this cause, defendant's exhibit 46, an uncertified photocopy of the French patent, was admitted in evidence over objection. Defendant has now offered in evidence its exhibit 62, a certified copy of that document bearing a stamp indicating that it was filed in the U. S. Patent Office on April 20, 1964. In its brief, defendant states that it obtained that document shortly before trial "against the contingency" that its uncertified exhibit 46 might not be admitted. When 46 was admitted, defendant did not offer the certified exhibit. It was first produced on April 21, 1975, and at that time offered in evidence. Without condoning the intentional withholding of the document, it is nevertheless admitted in evidence for whatever value it may have.

That exhibit has no evidentiary value on plaintiff's possible knowledge regarding either the fact or date of publication of the French patent when the original application was prosecuted. Defendant was required to prove publication as a statutory bar, plaintiff's knowledge of that fact, and plaintiff's intentional concealment of that fact from the Patent Office. Even if the delayed exhibit be accepted as evidence of publication more than one year prior to the Goodrich-Waxlax application, there is no evidence to prove either knowledge or concealment.

There is also lacking any proof related to contentions that the Examiner was fraudulently misled during prosecution of the reissue applications. At that time the Examiner had before him all references herein cited by defendant upon the issue of obviousness, including Lokey and the French 471 patent. He also had before him the motions and supporting affidavits filed in this cause and the transcript of the testimony of Waxlax and Goodrich before this court related to those issues. Commercial success claims proposed to the Examiner were supported by the proffer of a complete transcript of the testimony of Mr. Searle before this court.

The file wrappers indicate that the Examiner was fully advised on the background and history of the reissue applications, including full advisement as to circumstances surrounding Mr. Waxlax's verification of the original application. They also reflect a first action by the Examiner denying all claims as unpatentable over Lokey, plaintiff's response to that ruling, and a subsequent conference with the Examiner. Following that conference, the claims were allowed.

The response to the initial action of the Examiner, *inter alia,* included the contention that Lokey was not a prior art reference, inasmuch as the 287 application was prior in time to the filing of the Lokey application. Reference was made to *In re Bass,* 474 F.2d 1276, 59 CCPA 1342 (1973), and *Application of*

*Frilette,* 436 F.2d 496, 58 CCPA 799 (1971), as supporting that position. That sequence of events leads to a contention by defendant that those references misled the Examiner, with the result that reissue was allowed, with the Examiner rejecting Lokey as prior art. That contention is faulty for three reasons. First, the cited cases do lend support to the position taken in the response, and the reference to them cannot be construed as a misrepresentation. Secondly, the court will neither presume that the Examiner did not consider the bearing of those cases upon his decision, nor that he was too dense to understand them. Thirdly, the statement by defendant that the Examiner did not consider Lokey as prior art is an interpretation by counsel, not a record fact. In the last context, the response not only cited those case references, but, also, urged that the claims were allowable over Lokey as a prior art reference. The claims were later allowed on the files as then constituted by notification of allowance. The file wrappers are equally consistent with the interpretation that the Examiner did consider Lokey as a prior art reference when that final action was taken.

Moreover, defendant had notice on August 16, 1974, that the reissue applications had been filed. The applications were not formally allowed until October 30, 1974, and November 13, 1974, respectively, and the patents did not issue until January 28, 1975. It had adequate opportunity to contest the accuracy or sufficiency of affidavits or other representations contained in the file. By its own admission, it did nothing.

■■■ The Examiner has ruled upon the applications, including the question of the sufficiency of supporting information. Though it be true, as defendant suggests, that the Patent Office action is subject to review, it is also true that that action is clothed with the same presumption of regularity as is any other of its actions. Something more than the belated protestations of counsel is necessary if the Examiner's decision is to be now undone.

### Defendant's Claim of Intervening Rights as Against RE317 and RE318

■■■ Under the provisions of 35 U. S.C. § 252, enacted in 1952, a person may continue his use of an inventive concept claimed in a reissue patent, such use having commenced prior to reissue, "unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent." [11]

That section merely codified equitable principles devolved under the prior law. Thus, the courts had held that intervening rights did vest as to the manufacture and sale of any article which was not included in the original claims, but that no intervening rights arose against any reissue claim which was identical to a claim of the superseded original patent. *E. g., Kansas City Southern Ry. Co. v. Silica Products Co.,* 48 F.2d 503 (8th Cir. 1931), *cert. denied,* 284 U.S. 626, 52 S.Ct. 11, 76 L.Ed. 533. Deci-

---

11. That section provides in pertinent part: "The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form, but in so far as the claims of the original and reissued patents are identical, such surrender shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent, to the extent that its claims are identical with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent.

"No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent."

sions construing Section 252 have held that no intervening rights arise against a reissue claim which is identical to a valid claim of the original patent. *E. g., Akron Brass Co. v. Elkhart Brass Mfg. Co.,* 353 F.2d 704, 708–709 (7th Cir. 1965); *Schnell v. Allbright-Nell Co.,* 348 F.2d 444, 450 (7th Cir. 1965); *Weller Mfg. Co. v. Wen Products, Inc.,* 231 F.2d 795, 799 (7th Cir. 1956).[12]

Decisions sustaining a claim of intervening rights have arisen in the classic situations in which the original claims which were carried over into a reissue patent were substantively invalid, *e. g., G. Leblanc Corp. v. H. & A. Selmer, Inc.,* 310 F.2d 449, 453–454 (7th Cir. 1962), or in which the reissue claims are broader than the superseded original claims. *E. g., Keller v. Adams-Campbell Co.,* 264 U.S. 314, 317, 44 S.Ct. 356, 68 L.Ed. 705 (1924); *Moto Meter Gauge & Equip. Corp. v. E. A. Laboratories,* 55 F.2d 936 940 (E.D.N.Y.1932). Inasmuch as all RE317 and RE318 claims are identical to the superseded original claims, no intervening rights could arise unless it must be held that the original claims were legally invalid.

Defendant argues that the court must determine that the 356 and 451 patents are invalid as non-patentable over the prior art, and that, ergo, there is no "valid" claim of those original patents which is carrier over into RE317 and RE318. However, the issue presented here is not quite so simplistic.

If it be assumed, for the sake of exposition, that without reissue the 356 and 451 patents would fall as anticipated by plaintiff's French patent, there yet remains the question whether that patent remains as a relevant reference under the facts of record. The effect of the allowance of reissue with the "continuation-in-part" reference is to give the applications upon which the patents issued an effective filing date which antedates the French patent. It would follow that the latter patent no longer exists as a reference against either the original patents or the reissue patents. The reissue patents contain no substantive change. They merely correct the identity of inventorship and revise the effective date of constructive notice.

Defendant correctly observes that the issuance of a patent is constructive notice to the world of a claim of monopoly, that practitioners in the art are entitled to rely upon the patent as the patentee's final expression defining his proprietary rights, and that such persons may proceed with the manufacture of any article not covered by a valid claim of the patent. However, defendant reads too much into that hornbook statement of equitable principle. Though a practitioner may rely upon the claims of a patent as the total statement of the inventive concept claimed, he acts at his peril when he usurps the inventive concept which is embodied in the presumptively valid claims. His personal determination that the claims are invalid is not a defense to a claim of infringement.

In essence, the above observation describes this defendant's conduct. Defendant was chargeable with notice of the content and scope of the original patent claims. It was equally chargeable with knowledge that its use of the inventive concepts therein described might lead to a claim that the patents were infringed. Acting upon the assumption that the claims were invalid, it thereby assumed the heavy burden of proving such invalidity to successfully

---

12. It would seem that the word "valid" adds nothing to the legal principle stated, and that the word of critical significance is "identical." It is axiomatic that an invalid claim does not attain validity by its being incorporated in a reissue patent.

The doctrine of intervening rights assumes the existence of a valid reissue claim. In the circumstance of a substantively invalid original claim being incorporated into a reissue patent, the issue arising is the question of validity of the reissue claim. If there is no valid claim, and thus no right of inventive monopoly, there is no basis for invoking the intervening rights doctrine.

defend against a claim that the patents were infringed.

 No reported case is found which is precisely in point on this issue. In a somewhat similar context, applying a prior statute, the United States Court of Appeals for the Eighth Circuit held that the use of the inventive elements of an original claim, upon the user's speculation that such claim was invalid, did not create any intervening right against a reissued patent. *Kansas City Southern Ry. Co. v. Silica Products Co.*, 48 F.2d 503 (8th Cir. 1931). The same principle must apply here. It must be deemed immaterial that, but for the reissue, the claims of the original patents might be shown to be anticipated by the French patent and, thus, invalid.

It cannot be said in any literal sense that the validity of these claims was created by their inclusion within the reissue patents. The only result of the action of the Commissioner in granting the reissue patents was to negate an apparent state of facts which might have presented a viable defense.

It cannot be said in equity and conscience that any intervening rights arose in the premises.

### Patent Misuse

Defendant asserts, as a defense against all three patents in suit, that relief should be denied to plaintiff because of its misuse of the patents. Specifically, it is contended that plaintiff has conditioned the sale of an unpatented field closer unit upon the acceptance of a license under the three patents. Thus, defendant asserts that the plaintiff has tied its sale of a nonpatented commodity to the acceptance of licenses under the Lokey and Goodrich patents.

That theory is a novel expansion of the patent-misuse principle. It is not only a premise lacking any firm legal foundation, but, also, a will-o-the-wisp, substantially lacking in evidentiary support.

Defendant, for support of this theory, relies upon three documents in evidence.

The first derives from a non-exclusive licensing agreement between plaintiff and Bancroft Bag, Inc., executed in 1972. Reliance is placed upon a statement in a letter from an agent of plaintiff to an agent of Bancroft which states in part: "As we discussed, when you sign the pinch bottom licensing agreement, your salesmen will also have the opportunity to sell St. Regis pinch bottom field closers along with your bags." Reliance is also placed upon two proposed agreements submitted by plaintiff to Chase Bag Company. The first involved a tendered license under the Lokey and Goodrich patent applications. The second was a contemporaneously submitted service agreement which included the provision that St. Regis could, during the life of the patent license agreement, "sell or lease to Chase" filling or closing equipment of whatever kind "St. Regis is at such time selling, or leasing" to other customers. Chase did not accept the licensing proposal.

There is nothing more, except that the record does reflect that plaintiff has from time to time submitted to its competitors, including the defendant, proposals for licensing agreements under the patents which contained no reference to field closers or other unpatented commodities which plaintiff sells.

 No purpose is served in belaboring the issue. Perhaps the most incisive exposition upon the subject of patent misuse is found in *General Tire & Rubber Co. v. Firestone Tire & Rubber Co.*, 349 F.Supp. 333, 341–344 (N.D. Ohio 1972). In the course of an exhaustive review of reported cases, that court accurately stated the applicable principles as follows:

"[Licensing agreements which have been determined to constitute patent misuse] are tying arrangements which require the purchase of unpatented goods [as a condition for the grant of a patent license]. 349 F.Supp. at 342. "[Unless a patentee has placed a construction upon a patent license agree-

ment which would grant to him a broader monopoly than that which his patent affords], the patentee could not be deemed guilty of misuse. *Ibid.*

"To invoke the doctrine of patent misuse, the challenger must establish that the patentee used the patent in an attempt to monopolize the sale of unpatented goods or to gain some market or other advantage [to which he is not entitled by virtue of his patent monopoly]." 349 F.Supp. at 344.

No decided case is cited to, or found by, the court which suggests that the tying of a non-patented article as a condition for the grant of a license under a patent would constitute misuse of the patent; but, in any event, disposition of this argument in the case at bar rests upon the simple conclusion that the contention, if the same be legally tenable, is almost totally lacking in evidentiary support.

*Summary and Ultimate Findings and Conclusions*

The above memorandum contains this court's findings of fact and conclusions of law. The shotgun approach to defense adopted here, while containing some resourceful elements, in the judgment of this court, fails to reach the mark with significant force.

Each, Lokey Patent No. 3,650,460, Goodrich Reissue Patent No. RE28,317 and Goodrich Patent No. RE28,318, is valid. Those patents are infringed by products manufactured by the defendant, as exemplified by the several exhibits hereinabove found to infringe. Plaintiff is entitled to a judgment enjoining further infringement of the several patents, or any of them, to its damages for prior infringements and its costs of suit. Plaintiff's damages will be computed at the rate of 1.2% of defendant's net sales of infringing units produced, the said percentage figure being based upon the royalty specified in plaintiff's standard licensing agreement under the patents in suit, which

must be considered reasonable and a sound basis for computing damages.

This suit is not deemed to be the exceptional case which would require the award of attorneys' fees under the provisions of 35 U.S.C. § 285, or justify the awarding the treble damages under 35 U.S.C. § 284.

Judgment is entered for the plaintiff against the defendant as follows:

a. Defendant is enjoined from further infringement of the patents in suit.

b. Plaintiff shall recover from defendant its damages, computed on the basis of 1.2% of defendant's net sales of infringing units, with computation of the amount of damages to abide an accounting by defendant before this court.

c. Plaintiff shall recover from defendant its costs of suit.

d. Defendant's counterclaim directed against the patents in suit is dismissed with prejudice.